*FILED*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

*MAY 30 PM 3: 08*

*U.S. DISTRICT COURT*
*N.D. OF ALABAMA*

| | | |
|---|---|---|
| PEGGY SMITH, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-96-N-0497-NE |
| | ] | |
| MAPLES INDUSTRIES, INC., | ] | |
| and KERRY BRADFORD, | ] | **ENTERED** |
| | ] | |
| Defendant(s). | ] | MAY 30 1997 |

**Memorandum of Opinion**

## I.   Introduction

Plaintiff Peggy Smith ("Ms. Smith") claims that her employer, Maples Industries Inc. ("Maples"), sexually harassed her and then discharged her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*  She also claims that another employee, Kerry Bradford ("Mr. Bradford"), sexually harassed her, invaded her privacy, and intentionally caused her emotional pain.[1] The court currently has for consideration separate motions for summary judgment filed by the defendants, as well as their motions to strike the plaintiff's declaration under penalties of perjury which she filed in response to the summary judgment motions.

The motion for summary judgment of defendant Bradford will be granted in its entirety. The similar motion of defendant Maples will be granted in part and denied in part. The motions to strike will be denied.

---

[1] Ms. Smith originally included Title VII claims against Mr. Bradford personally. Those claims were dismissed by order of April 23, 1996.

*34*

## II.   Undisputed Facts[2]

Maples Industries ("Maples"), a manufacturer of bath and scatter rugs, operates two manufacturing plants in Scottsboro, Alabama, employing more than 830 workers. Ms. Smith began working there as a creeler on June 1, 1993, and was promoted to inspector in September of that year. Mr. Bradford was employed by Maples on March 1, 1993, as a creeler and was promoted to the position of Leadperson, something in the nature of a working foreman, in the Yardage Department in February 1994. Though not technically a supervisor, Mr. Bradford was charged with insuring that products were produced on a timely basis and that employees for whom he was responsible were doing their job. At all times material to this action Mr. Bradford worked as a Leadperson on the same shift as Ms. Smith and another employee, Melvin Tucker.

The evidence in the case suggests a more-or-less affable working atmosphere during most of the two-year period between the time Ms. Smith was hired, June 1, 1993, and the date she was terminated, May 11, 1995. It, seemingly, was not uncommon for employees, including Ms. Smith and Mr. Bradford, to "lock arms" in a friendly way, engage in friendly banter, take work breaks together, and consult with other workers about personal problems. It was not uncommon for people on Ms. Smith's shift to discuss their problems with each other.

---

[2] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2

Ms. Smith, however, alleges that Mr. Bradford regularly made comments about her appearance, and on one occasion called her into his office to remark that he could see into her blouse. In addition to casual physical contact, the plaintiff insists that Mr. Bradford would place his arm around her and rub her shoulders. She says that Mr. Bradford would often walk up to her, throw his arm around her, and escort her throughout the plant and once asked what she used to make herself "soft." The plaintiff contends that Mr. Bradford often talked about his sex life and commented on his wife's "skimpy" underwear. She also contends that once, in a group including herself, he discussed his use of a condom with a girlfriend. She says that he once told another employee about the plaintiff that he "wanted some of that" and that she might be "good," and that he became very possessive of her having "an almost purient interest in her personal affairs." Ms. Smith insists that she responded to this conduct by pushing the plaintiff away, avoiding him, or mildly admonishing him but did not find it sexually offensive.

In February of 1995, the plaintiff separated from her husband and began dating Melvin Tucker. Maples has no company policy against employees dating each other and in fact several employees at the Maples plant have done so. However, despite this policy, the plaintiff contends that when Mr. Bradford learned she was dating someone at the plant he repeatedly asked her who it was and told her that she would be fired. Ms. Smith contends that after Mr. Bradford learned that it was Mr. Tucker whom plaintiff had been dating, Mr. Bradford would not speak to her, watched her "continuously," refused to allow her to obtain footage and color codes she needed for her work, refused to assist when her rug became caught in a machine, and "was very hateful."

3

Ms. Smith testified that Mr. Bradford threatened to separate Mr. Tucker and herself, and regularly sent Tucker to work at Maples' second plant. She also says that Bradford began to regularly assign Tucker to the most difficult machine to operate. Finally she contends that in March of 1995, Mr. Bradford called Mr. Tucker and talked with him for several hours about his relationship with the plaintiff.[3] At or about this time Mr. Tucker called Supervisor John Maples at home and complained to him about Mr. Bradford's conduct. Tucker did not then claim that Ms. Smith was being sexually harassed by Bradford but stated only that Bardford had a problem with the relationship between Smith and Tucker.

At about 8:30 to 9:00 p.m. on the evening of May 10, 1995, Ms. Smith and Mr. Tucker consumed some amount of alcohol. Ms. Smith testified in deposition that Mr. Tucker had mixed vodka and orange juice drinks for them but stated that she had drunk only a portion of hers. At midnight, they reported to work at Maples.[4] After receiving reports from co-workers that Smith and Tucker appeared to have been drinking and observing them himself, Bradford called Mr. Maples at home and reported what he had learned. He did not remove either the plaintiff or Tucker from their work.

Eventually, Mr. Maples went from his home to the plant and summoned Mr. Bradford and the plaintiff into his office. At that meeting the plaintiff admitted that she had drunk one mixed drink at about 9:00 p.m. before her shift. At that same meeting she contends that she

---

[3] The defendants deny that Mr. Bradford treated the plaintiff in the manner claimed by her or that he ever acted in any inappropriate way.

[4] The evidence indicates that Smith and Tucker regularly worked from 6:00 p.m. to 6:00 a.m. shift except on Wednesday, when they sometimes worked 12:00 midnight to 6:00 a.m. shift. May 10, 1995, was a Wednesday.

also told Mr. Maples that she needed to talk with him about Mr. Bradford's conduct but did not suggest that it involved a claim of sexual harassment. Mr. Maples made an appointment for the plaintiff and Mr. Tucker to return at 2:00 p.m. on Thursday, May 11, 1995. At the meeting on Thursday, with acting personnel manager Larry Bailey, he fired both Smith and Tucker for drinking prior to going to work on Wednesday. After she was terminated, Ms. Smith, for the first time, asserted to a member of Maples' management that Mr. Bradford had been sexually harassing her at work.

Mr. Bailey made a brief investigation of the claim of sexual harassment but did not document either the investigation or any conclusions he might have reached. Mr. Bradford was not disciplined.

## III.  **Standard of Review**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in

5

support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same

6

standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

7

# IV. Discussion

## A. Claims Against Kerry Bradford

### 1. Tort of Outrage

To establish an outrage claim, the conduct in question must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981). A determination as to whether conduct is sufficiently objectionable to support a cause of action for outrage may be made by the trial court as a matter of law. *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985).

The facts in the present case can be compared to those found in *McIssac v. WZEW-FM Corp.*, 495 So. 2d 649 (Ala. 1986). In *McIssac*, the plaintiff alleged that the president of the company where she worked asked her to have an affair with him, tried to kiss her, looked at her with "illicit intent," asked her to "come to him," and asked her to visit him in another state. *McIssac*, 495 So. 2d at 650. The plaintiff in *McIssac* claimed she was fired because she refused to surrender to her employer's advances. *McIssac*, 495 So. 2d at 650-51. The Alabama Supreme Court held that the plaintiff in *McIssac* failed to state an actionable claim for outrage, because the employer's conduct did not reach the requisite level of "extreme and outrageous conduct." *McIssac*, 495 So. 2d at 651. Given that the employer's conduct in *McIssac* did not constitute an actionable claim of outrage, the court finds that the conduct in the present case, which involves conduct not as severe as that in *McIsaac*, also fails to constitute an actionable claim of outrage. Therefore, the defendants'

8

motion for summary judgment in regard to the outrage claim will be granted, and plaintiff's outrage claim will be dismissed with prejudice.

## 2. **Invasion of Privacy**

The plaintiff's action for invasion of privacy is based on the alleged intrusion upon her physical solitude or seclusion. *Plaintiff's Response to Maples*, at 46. *See McIsaac*, 495 So. 2d at 651 (holding that an action for invasion of privacy premised on sexual harassment is known as a wrongful intrusion into one's private activities), citing *Philips v. Smalley Maintenance Services*, 435 So. 2d 705, 708 (Ala. 1983). In *McIsaac*, the Supreme Court of Alabama held that a defendant's actions had to intrude into a plaintiff's "private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac*, 496 So. 2d at 651. For example, in *Phillips v. Smalley Maintenance Services*, the supreme court found liability where the defendant, over a three-month period, repeatedly interrogated the plaintiff behind locked doors about private sexual matters. In *McIsaac*, the supreme court did not find liability, stating that "'[e]ven the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability.'" *McIsaac*, 495 So. 2d at 652, quoting *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 124 (Ala. 1985).

In this instance, Mr. Bradford's alleged conduct does not reach the level of intrusive and coercive behavior contemplated by the Alabama Supreme Court in *Philips* and *McIsaac.* Therefore, the defendant's motion for summary judgment on the invasion of

9

privacy claim will be granted, and the invasion of privacy claim will be dismissed with prejudice.[5]

## B.   Claims Against Maples Industries, Inc.

### 1.   Discriminatory Discharge

The complaint alleges

[t]he conduct of Maples Industries as set forth above constitutes violations of plaintiff's rights guaranteed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, in particular plaintiff's right not to be discharged on the basis of sex.

*Complaint*, at 6. The complaint states that "[t]his is an action for legal and equitable relief to redress unlawful discrimination in private employment on the basis of sex and retaliation against plaintiff." *Id.* at 1. The plaintiff does not now and, apparently, has never claimed that she was discharged because of her sex. Likewise, she does not argue that she was discharged in retaliation for having made complaints of sexual harassment.

Any such claim in this case would, in any event, be unavailing. To establish a prima facie case of discharge in retaliation for exercising rights under Title VII, a plaintiff must show

1.   that she engaged in a statutorily protected act to vindicate rights accorded her under Title VII,

2.   that an adverse employment decision was taken against her, and

---

[5] It is interesting to note that though the plaintiff claims that Bradford conducted himself outrageously toward her and invaded her privacy by, *inter alia*, discussing her private life, she concedes that between December 1994 and February 1995 she sought his advice concerning her own marital problems and impending breakup with her then husband.

10

3.     a causal link between the protected act and the adverse employment
       decision.

*Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98, 101 (11th Cir. 1982).  Maples argues that

"Smith fails to establish a prima facie retaliation case because she simply did not report to

anyone in management the alleged illegal conduct by Bradford.  Smith also fails to

establish a causal connection between the alleged 'protected activity, and the decision by

Bailey to terminate Smith'".[8]  *Maples Industries Initial Submission in Response to Exhibit*

*D (hereinafter Maples' Brief in Support)*, at 23.

The court agrees that the plaintiff can make no case for retaliatory discharge under

Title VII.  The evidence is that the plaintiff made no complaint about Mr. Bradford's alleged

conduct until *after* she was terminated.[7]  The plaintiff's deposition reads:

Q.     Well, you were told that you were fired before you explained the
       treatment to Mr. Bailey?

A.     Well, they knew why I was coming.

Q.     Well, wait a minute.  You didn't tell Mr. Bailey or Mr. Maples about
       any problems with Mr. Bradford before you were terminated, is that
       correct?

A.     I told John that I had some problems with Kerry and I needed to talk
       to him, and he said, call me tomorrow and we'll set up a time.

Q.     Did you tell him specifically what those problems were?

A.     I don't think so, you know, because I was very upset that night.

---

[8] The court addresses this issue only out of an abundance of caution, fearing that the plaintiff may now claim that she intended to include a retaliatory discharge claim.

[7] In fact, the plaintiff has failed to offer any support whatsoever on her discriminatory discharge claim. Instead she focuses only on her quid pro quo harassment and hostile work environment claims.

11

*Smith Deposition of October 9, 1996*, at 98. Because Mr. Bailey fired Ms. Smith, and he had not received any complaints about Mr. Bradford until after he fired her, the termination of which she complains could not have been in retaliation for having complained of that alleged conduct.

### 2. **Claims of Sexual Harassment**

#### a. **Quid Pro Quo Sexual Harassment**

The plaintiff makes a claim for quid pro quo sexual harassment. "The prima facie elements for this cause of action that the plaintiff must prove include: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to the unwelcome behavior affected tangible aspects of the employees compensation, or terms, conditions, or privileges of employment." *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994).

The plaintiff states that "[i]n this case, the record demonstrates that factual issues exist regarding the question of whether plaintiff has suffered the ultimate job detriment -- termination -- because of the employer's use of a prohibited criterion of sex." *Plaintiff's Response to Maples*, at 25-26. However, Maples insists that "[t]he record here . . . is devoid of any evidence tending to demonstrate that the Plaintiff was denied a job benefit or suffered a job detriment as a result of her failure to engage in any unwelcome conduct with Bradford." *Maples Brief in Support*, at 22.

As an initial matter, there is evidence that the conduct the plaintiff complains of was unwelcome. It is undisputed that Ms. Smith objected, albeit mildly, to Mr. Bradford's

12

conduct prior to his discovery of her relationship with Mr. Tucker. *Plaintiff's Claimed Undisputed Fact # 38 and Defendant's Admission Thereto.* In addition the plaintiff has testified that after Mr. Bradford learned of her relationship with Mr. Tucker, he created working conditions severe enough that she wanted to "change shifts in order to transfer away from Bradford and to work under a different leadman." *Plaintiff's Declaration*, at 3. Accordingly, there is evidence that Ms. Smith did not welcome the alleged conduct by Mr. Bradford.

There is evidence that after Mr. Bradford learned whom the plaintiff was dating he confronted the plaintiff. Ms. Smith testified:

> Q.    Well, tell me what you mean by he got upset? Did he say something to you to indicate --
>
> A.    Yes.
>
> Q.    Well, tell me what he said to you.
>
> A.    He took me into a room. I think it is the maintenance room that's off from one of the creel racks. And he told me that Larry Bailey would fire me because you wasn't supposed to do that.

*Smith Deposition of June 26, 1996*, at 65. The plaintiff contends Mr. Bradford made these comments despite the fact that Maples had no policy forbidding co-workers from dating. The plaintiff has also testified that Mr. Bradford's mood changed towards her dramatically after she began dating Mr. Tucker. *See Id.* at 69-70. She testified that he would not allow her to perform all of the functions of her job, refused to assist her when she had difficulty running her machine, and was "very hateful" on those occasions when he did offer help. *Id.*; *Smith Deposition of October 9, 1996*, at 96. It is undisputed that after these incidents,

13

it was Mr. Bradford who reported the plaintiff and Mr. Tucker for being under the influence

of alcohol. That report led directly to their termination.

Maples argues that "[e]ven if Bradford's conduct were assumed to be unwelcome

by Smith, she undeniably failed to so inform anyone in Maples' management prior to her

termination." *Maples' Reply Brief*, at 13. It continues that

> Bradford did not terminate Smith; he couldn't. Larry Bailey, Maples' plant
> manager, terminated Smith for violation of Maples' substance abuse policy.
> Bailey made the sole decision to terminate Smith. He had no input from
> Bradford, or anyone else for that matter. Bailey believed that Smith's
> admission that she had consumed alcohol before coming to work was
> sufficient grounds to terminate her.

*Maples' Reply Brief*, at 13-14. Thus, the defendants argue that because Mr. Bailey did not

know about Ms. Smith's rebuke of Mr. Bradford, the termination is not connected to the

harassment.

The court cannot agree with the defendants. The undisputed evidence is that Kerry

Bradford initiated the report that ultimately led to the plaintiff's termination. Moreover, there

is a genuine issue of material fact regarding whether Bradford knew of other workers who

had consumed alcohol before reporting and whether he treated the plaintiff in the same

manner he treated such other persons. If Bradford knew of others who reported to work

after drinking alcohol but did not report them (as he did Smith) and reported Smith, as may

be fairly inferred, because she spurned his advances, then the plaintiff will have established

quid pro quo sexual harassment.

14

## b.    Sexually Hostile Work Environment

To make out a prima facie case of hostile work environment sexual harassment against Maples the plaintiff must show: 1) that she belongs to a protected group; 2) that she was subjected to unwelcome sexual harassment; 3) that the harassment was based on sex; 4) that the harassment affected a "term, condition, or privilege" of her employment; and 5) that Maples knew, or should have known, of the harassment and failed to take remedial action. *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F. 2d 900, 903 (11ᵗʰ Cir. 1988). Although Maples concedes that the plaintiff is a member of a protected group, it contends that the plaintiff cannot satisfy the remaining elements for a hostile work environment claim.

First, as to the conduct of Mr. Bradford, the defendant argues that the plaintiff has presented no evidence that the conduct was unwelcome. Specifically, it cites the fact that the plaintiff "never complained to anyone in management about Bradford's alleged conduct or advances." *Maples' Brief in Support*, at 18. As noted above, the court finds the plaintiff has presented sufficient evidence from which a jury could conclude the plaintiff did not welcome Mr. Bradford's alleged advances. In addition, Title VII has no requirement that the plaintiff report advances in order that they be considered "unwelcome."

Maples also argues that "[t]he conduct of Bradford of which Smith complains did not affect a 'term, condition or privilege of employment.'" *Id.* To be actionable, the harassment at issue must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11ᵗʰ Cir. 1982). The defendant argues that "[t]he alleged harassment of . . . Smith did not alter the conditions of Smith's employment because Smith did not

15

subjectively perceive the work environment to be abusive or hostile." *Maples' Brief in Support*, at 19. Indeed, the plaintiff testified as to Mr. Bradford:

A.   He was a touching person but he did that to different people. So I didn't really, you know, I didn't consider that as sexual harassment at the time.

Q.   Describe what you mean by touching, in what manner?

A.   Putting his arm around you, touching you, rubbing your shoulders, things like that.

Q.   All right. Did you ever personally take offense at any of that?

A.   No, because he was doing it to everyone at that time.

*Smith Deposition of June 26, 1996*, at 39-40.

The plaintiff also testified in deposition:

A.   [Mr. Bradford] was always nice. He was nice. He asked me one time, he said, you are so soft. What do you put on to make you so soft? And I said, Jergens.

Q.   Did you interpret that as being a sexual comment?

A.   Not at that time.

*Smith Deposition of June 26, 1996*, at 51. Maples erroneously cites this passage as evidence that "Smith stated that she was not offended by any comments made to her by Bradford at the time they were made." *Maples' Undisputed Fact # 59.* Clearly, this comment applies only to the incident where Mr. Bradford remarked that Ms. Smith had soft legs.

Elsewhere in Ms. Smith's deposition testimony the following exchange occurs:

Q.   Well, did you consider those statements made to you or in your presence as some form of sexual harassment?

16

A.   Well, sex seemed to be a thing. That was a big conversation most of the time, you know.

Q.   My question is: Did you consider that to be sexual harassment of you?

A.   Of just me?

Q.   Right.

A.   No, because he was telling it.

*Id.* at 91-92. Ms. Smith, in her declaration explains:

> The comments which Bradford made in my presence about his wife's sex life, his wife's underwear and his sexual activities with a girlfriend were offensive and embarrassing to me. I was never clear of the definition of sexual harassment, and I did not understand whether this definition included language that was made in my presence. That is why I answered that I did not believe these to be sexually harassing comments, because Bradford was "telling" them.

*Smith Declaration*, at 2-3. Maples has moved to strike this portion of the plaintiff's

declaration as contradictory to her deposition testimony. However, her declaration seems

consistent with her deposition testimony at pages 91 and 92 which indicates that she felt

it wasn't harassment "because he was telling it." The declaration seems to be merely a

explanation of her misunderstanding of the term sexual harassment.

Regardless of whether Ms. Smith understood the concept of sexual harassment at

her June 26, 1996, deposition, she did testify, on that same occasion, that Mr. Bradford's

comments upset her. The testimony reads:

Q.   Just keep it in the framework of the question. What I had asked you was the statements or things that he did that you considered humiliating. And are you testifying here now under oath that these statements that you're relating to us about his sex life, or button up your blouse --

17

A. Yes.

Q. -- those things, you found them to be humiliating?

A. Yes.

*Smith Deposition of June 26, 1996*, at 88. "Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). Humiliating sexual comments constitute the type of "gauntlet" to which the Supreme Court in *Meritor* referred. Accordingly, there is evidence that, as to the comments made by Mr. Bradford in her presence, the plaintiff subjectively perceived a hostile or offensive environment.

Maples can be responsible for Mr. Bradford's alleged conduct either directly or indirectly. *Faragher v. City of Boca Raton*, 1997 WL 204926 (11th Cir. (Fla.)). "An employer is directly liable for hostile environment sexual harassment if it knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action." *Faragher*, at *3. Under this theory of liability Maples may be held liable for its own negligence or recklessness, but not for the conduct of its supervisors or employees. *Id.*

Because the evidence indicates that Ms. Smith never informed management about the alleged harassment until after she was terminated, Maples insists that it cannot be responsible for Mr. Bradford's harassment. However, that is not the case. "The employee

can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment, *or by showing the pervasiveness of the harassment*, which gives rise to the inference of knowledge or constructive knowledge." (emphasis supplied.) *Henson v. City of Dundee*, 682 F. 2d 897, 905 (11th Cir. 1982).

Leadman Jim Corbitt testified that he knew that Mr. Bradford "had a thing" for the plaintiff. *Corbitt Deposition*, at 36. He also testified that he received this information from at least four individuals on his shift.[8] In addition, Mr. Corbitt says that everyone on his and Mr. Bradford's shifts knew that Mr. Bradford was jealous of Ms. Smith's relationship with Mr. Tucker. *Id.* at 35. He further stated that Mr. Bradford himself came to him to discuss whether it was appropriate for him to admonish the plaintiff and Mr. Tucker for having a relationship. *Id.* at 34. It is undisputed that Mr. Corbitt reported to Mr. Bailey that Mr. Bradford flirted with the plaintiff and she did not flirt back. When Mr. Bailey probed further into Mr. Bradford's conduct, Mr. Corbitt revealed to him that Mr. Tucker had complained to Mr. Corbitt about the way the plaintiff was treating him. However, it is unclear as to whether Mr. Corbitt's conversations with Mr. Bailey occurred during Mr. Bailey's investigation of Ms. Smith's complaints after she was fired or before.

---

[8] In their response to this claimed undisputed fact, Maples admits that Mr. Corbitt said this in his deposition but insists the statement is hearsay because his knowledge came from four employees in the plant. Because it is not the employees statement that is being considered but instead Mr. Corbitt's own testimony as to his state of mind, the evidence is not hearsay.

19

It is also undisputed that in March of 1995, Mr. Tucker called John Maples at home to complain about Mr. Bradford. Referring to that conversation in his deposition, the following exchange occurred:

Q.      What was that, tell me what you said specifically?

A.      I just told him that we needed to have a talk about Kerry and his problem with me and Peggy seeing each other.

\* \* \*

Q.      All right. Is that the only conversation you ever had with John Maples about this problem with Kerry and you and Peggy?

A.      Right. There wasn't nobody concerned about that problem because it wasn't a problem to them.

\* \* \*

Q.      Did you ever say or even hint, suggest that Kerry Bradford was in love with Peggy or making moves on her or anything like that?

A.      To John on the phone?

Q.      Correct.

A.      No.

*Tucker Deposition*, at 48, 92-94.

The court is not prepared to say as a matter of law that the alleged harassment was so benign that Maples should not have been aware of it. Mr. Corbitt's testimony indicates that many individuals at the plant knew of the alleged situation between Mr. Bradford and Ms. Smith. In addition, although Mr. Tucker did not specifically mention sexual harassment in his conversation with Mr. Maples, he did inform Mr. Maples about Mr. Bradford's "problem" regarding himself (Tucker) and Ms. Smith. The evidence is such that a

20

reasonable jury could find that the conduct was pervasive enough to put Maples on notice that it was occurring.

## V.     Conclusion

By separate order, to be entered contemporaneously herewith, the court will:

1.      Grant the motion of defendant Kerry Bradford in all respects;

2.      Grant the motion of defendant Maples Industries, Inc. as to any asserted claim of retaliatory discharge;

3.      Deny the motion of defendant Maples Industries, Inc. as to all claims of sexual harassment; and

4.      Deny the motions to strike filed by both defendants.

Done, this __30th__ of  May, 1997.

_____

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

21